**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 1:19-cv-01383

THE ESTATE OF SUSANNE BURGAZ, by and through
personal representatives Erika Zommer, Kristian Arnold, and Amelia Eudailey;
ERIKA ZOMMER, individually;
KRISTIAN ARNOLD, individually; and
AMELIA EUDAILEY, individually;

     Plaintiffs,

v.

BOARD OF COUNTY COMMISSIONERS FOR JEFFERSON COUNTY COLORADO;
JEFF SHRADER, in his official capacity;
PETRINA PESAPANE, individually; and
JOSEPH SCALISE, individually;

     Defendants.

---

**CIVIL RIGHTS COMPLAINT AND JURY DEMAND**

---

Plaintiffs, by and through counsel, Zachary Warren of HIGHLANDS LAW FIRM, respectfully

allege for this Civil Rights Complaint and Jury Demand as follows:

## I. **INTRODUCTION**

1.     Susanne Burgaz was a 54-year-old detainee at the Jefferson County jail who died

in custody when officers flagrantly violated the very policies designed to protect inmates from

self-harm.

2.     On August 30, 2017, Susanne was booked into the jail on low-level, non-violent

offenses. During booking, officers recognized that Susanne was "red-flagged" as a suicide risk and

noted that she had a history of mental illness and substance use. As a result, she was assigned to

the Special Housing Unit ("SHU")—an area within the jail that is specifically designed for suicidal detainees and others with the most intensive needs.

3.	On August 31, 2017, Susanne went to court and was ordered released by the Judge given that her alleged offenses were very minor. Susanne was then escorted back to the SHU with the expectation that she would be released in a matter of hours.

4.	When she arrived back at the jail, however, one of the officers informed Susanne that she would not be released; instead, she would be held indefinitely because there was some confusion as to whether she had a warrant for a separate low-level, non-violent offense in a different jurisdiction.

5.	Immediately after delivering this devastating news, the officer placed Susanne in a dayroom—the only area in the SHU without suicide mitigation measures—and closed the door.

6.	Under the jail policies, officers were supposed to directly observe each of the inmates in the SHU at least once every 30 minutes.

7.	In flagrant violation of these policies, and immediately after delivering crushing news about her legal status, officers left Susanne completely unattended for 51 minutes.

8.	***Within mere minutes*** of receiving the devastating news that she would remain incarcerated, Susanne pulled the flat-screen television away from the wall, loosening the electrical cords behind the television, and began fashioning a noose.

9.	Over the next 8 minutes, Susanne tried and failed on two separate occasions to hang herself—all in plain view.

10.	Had any officer bothered to directly observe Susanne or glance at the video monitors located at the officer control station, she would be alive today.

11.	But no one was watching.

2

12.     On her third and final attempt, as officers casually chatted in the hallway outside, Susanne successfully fashioned a noose and hanged herself.

13.     Because no one was monitoring her well-being, it was ***another 30 minutes*** before officers found her body motionless and suspended from the cords. She died two days later after medical providers removed her from life support.

14.     To make matters worse, the failure to monitor Susanne was not an isolated incident; rather, it is part of a broader pattern of flouting jail policies designed to protect inmates from self-harm—something that has contributed to the spate of suicides that have plagued the Jefferson County jail.

15.     The Plaintiffs now bring this action to vindicate the extraordinary harms caused by the Defendants and the deprivation of rights secured by the United States Constitution and the laws of the State of Colorado and the United States of America.

## II.  <u>JURISDICTION AND VENUE</u>

16.     This action arises under the Constitution and the laws of the United States and the State of Colorado. This Court has original subject matter jurisdiction over the Plaintiffs' civil rights claims under 42 U.S.C. § 1983, pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights), and 42 U.S.C. § 1988 with respect to the award of attorney's fees. The Court also has supplemental jurisdiction over the Plaintiffs' state law claims under 28 U.S.C. § 1367 because the violations of federal law are substantial and the pendant causes of action derive from a common nucleus of operative facts.

17.     This Court has personal jurisdiction over all of the named Defendants because they either reside in the State of Colorado, they a governmental entity of the State of Colorado, and/or they conduct systematic and continuous business within the State of Colorado.

3

18. Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b) because all of the events and/or omissions giving rise to the claims contained in the Civil Rights Complaint and Jury Demand occurred within the State of Colorado.

19. The Plaintiffs timely filed a Notice of Claims regarding the allegations stated in this Civil Rights Complaint and Jury Demand as required by the Colorado Governmental Immunity Act, C.R.S. § 24-10-101, *et seq.*, and have otherwise exhausted all necessary administrative requirements prior to bringing this suit.

### III. <u>PARTIES</u>

*Plaintiff*

20. At all relevant times, the decedent, Susanne Burgaz, was an adult resident and domiciliary of the State of Colorado.

21. At all relevant times, Plaintiff Erika Zommer was a United States citizen and adult resident and domiciliary of the Commonwealth of Pennsylvania. Plaintiff Erika Zommer is the daughter of Susanne Burgaz and the co-Personal Representative of the Estate of Susanne Burgaz.

22. At all relevant times, Plaintiff Kristian Arnold was a United States citizen and adult resident and domiciliary of the State of Colorado. Plaintiff Kristian Arnold is the son of Susanne Burgaz and the co-Personal Representative of the Estate of Susanne Burgaz.

23. At all relevant times, Amelia Eudailey was a United States citizen and adult resident and domiciliary of the State of Colorado. Plaintiff Amelia Eudailey is the daughter of Susanne Burgaz and the co-Personal Representative of the Estate of Susanne Burgaz.

*Defendants*

24. Defendant Board of County Commissioners for Jefferson County Colorado ("BOCC") is a governmental entity chartered under the laws of the State of Colorado, which

represents, oversees, and sets policy for Jefferson County. BOCC operates a detention facility ("JCDF") through the Jefferson County Sheriff's Office ("JCSO"), which is located at 200 Jefferson County Parkway, Golden, Colorado 80419. The JCDF is a jail that confines pre-trial detainees and convicted prisoners. All pre-trial detainees in the jail are entitled to protection under the Fourteenth Amendment to the United States Constitution. Under COLO. REV. STAT. § 30-11-105, the BOCC is the proper party to name in an action against Jefferson County.

25. Defendant Jeff Shrader, in his official capacity, is the Sheriff for Jefferson County and a final policy-maker for Jefferson County with respect to all matters concerning the JCSO, including the operation of the JCDF. At all relevant times, Defendant Jeff Shrader was a United States citizen and adult resident and domiciliary of the State of Colorado, and acting under color of state law as an officer employed by JCSO.

26. Defendant BOCC and Defendant Jeff Schrader are hereinafter collectively referred to as the "Jefferson County Defendants."

27. The Jefferson County Defendants are sued under 42 U.S.C. § 1983 with respect to the challenged deliberately indifferent policies, practices, procedures, and habits regarding the care and treatment of individuals detained at JCDF.

28. At all relevant times, Defendant Petrina Pesapane was a United States citizen and adult resident and domiciliary of the State of Colorado, and acting under color of state law as an officer employed by the JCSO.

29. At all relevant times, Defendant Joseph Scalise was a United States citizen and adult resident and domiciliary of the State of Colorado, and acting under color of state law as an officer employed by the JCSO.

30. Defendant Petrina Pesapane and Defendant Joseph Scalise are hereinafter collectively referred to as the "Individual Defendants."

## IV. STATEMENT OF THE FACTS

31. Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

### The Life of Susanne Burgaz

32. Susanne Burgaz was an accomplished artist, community volunteer, small business owner, and the mother of three children.

33. Early in her career, Susanne Burgaz obtained a Master's Degree in Fine Arts, worked as a set designer for CBS in California, and later worked as the owner-operator of an upscale interior design company.

34. She was also well-known for volunteering in her community, devoting much of her time to working with individuals in recovery through an organization called Wisconsin Voices for Recovery.

35. Later in her life, though, Susanne Burgaz began displaying signs of serious mental illness, and also self-medicating using alcohol and other substances.

36. Because of her struggles with addiction, Susanne Burgaz experienced housing instability, sometimes living outside, and became entangled with the criminal justice system on numerous occasions—almost always related to her use of alcohol.

### Susanne Burgaz was a Known Suicide Risk at JCDF

37. On August 30, 2017, the Susanne Burgaz was booked into the JCDF on low-level, non-violent charges.

38. JCDF utilizes an information management system called "Tiburon," which contains information relative to an inmate's health, criminal history, notes from prior periods of incarceration at JDCF, and other historical information.

39. This data informs a wide host of decisions on the part of JCDF staff, including housing assignments.

40. When Susanne Burgaz was booked into the JCDF, she went through an intake process, during which JCDF staff accessed her Tiburon file, reviewed the historical information already in the system, and went through a standard questionnaire regarding her health status.

41. Among other relevant information, the Tiburon system revealed that Susanne Burgaz was "red-flagged" as a suicide risk because she was previously placed on so-called "suicide watch" in JCDF.

42. It is very unusual for an inmate to be red-flagged for suicide based on prior behavior within the very same facility, and serves as a clear indicator that the inmate represents a high risk for suicide or self-harm relative to other inmates.

43. The Tiburon system also revealed that Susanne had other significant medical and mental health needs, including a history of self-harm in jail settings, involuntary commitment to an inpatient mental health facility, suicidal ideation, chronic depression, chronic pain, physical disabilities, and a severe substance use disorder.

44. During the intake process, Susanne Burgaz also told JCDF staff that she recently survived an act of sexual violence, which was under investigation by another law enforcement agency—a recent trauma which again placed Susanne Burgaz at higher risk for suicide relative to other inmates at JCDF.

45. Due to a variety of factors, including the fact that she was red-flagged for suicidality, Susanne Burgaz was assigned to the Special Housing Unit ("SHU"), a secure housing unit for inmates with higher needs, which is described in more detail below.

46. The Jefferson County and Individual Defendants have a responsibility to identify inmates at higher risk for self-harm and suicide, and to take reasonable steps to ensure the safety of such inmates.

47. The risk for self-harm and suicide is dynamic—meaning it cannot simply be determined by a "snapshot" at booking.[1]

48. Correctional professionals and jail administrators, including Defendant Shrader and the Individual Defendants, know that inmates with the following characteristics represent the highest risk for self-harm:

   a. detainees with a history of serious mental illness;

   b. detainees with a history of suicidality;

   c. detainees housed in a secure unit;

   d. detainees with serious medical concerns;

   e. detainees with both severe personality disorders and co-occurring mental illness;

   f. detainees whose legal status has undergone a significant change for the worse; and

   g. detainees who identify as Caucasian.[2]

49. These objective indicators correspond exactly with Susanne Burgaz's presentation upon booking on August 30, 2017, and were only exacerbated on August 31, 2017, when

---

[1] Hayes, Linsay M. *Suicide Prevention in Correctional Facilities: Reflections and Next Steps*, INT'L J. OF LAW & PSYCHIATRY, Vol. 36(4) (2013) (noting that risk-assessment is an ongoing process; moreover, stating that receiving "bad news" regarding a court hearing is among the most significant risk factors for in-custody suicide and that the denial of suicidal ideation at intake is a poor indicator of actual risk).

[2] Patterson, Raymond, F. & Hughest, Kerry. Review of Completed Suicides in the California Department of Rehabilitiation, 1994 to 2004, Psychiatric Serv's, Vol. 59(6) (2008).

Defendant Pesapane informed her that she was ineligible for release following her court appearance earlier the same day.

50. Based on Susanne Burgaz's readily-available information in the Tiburon system, the information gleaned through the intake and assessment process at booking, and by virtue of her assignment to the SHU, the officers assigned to the SHU knew or should have known that she was an acute and distinct suicide risk at all times relevant to this action.

51. Specifically, the Individual Defendants knew or should have known that Susanne Burgaz was an acute and distinct suicide risk at all times, but, as described in more detail below, they nevertheless disregarded this excessive risk to her health and safety.

52. Moreover, at all relevant times, the Individual Defendants in this action were aware of the following:

   a. Susanne Burgaz was red-flagged for suicidality;

   b. individuals housed in the SHU were at increased risk for self-harm and suicidality;

   c. inmates housed in the SHU required a higher level of care and supervision relative to other inmates;

   d. failure to observe JCDF protocols regarding inmate safety—including failure to adequately observe or monitor inmates—increases the risk or self-harm and suicide;

   e. delivering "bad news" to an inmate, such as Susanne, regarding their legal status increases the risk of self-harm and suicide; and

   f. the dayroom in the SHU does not have the same level of suicide mitigation measures as other areas, making it the most dangerous room in the SHU.

9

***Increased Suicide Risk in the Dayroom***

53.     The dayroom itself is under constant video monitoring and is located adjacent to the control station in the SHU.

54.     However, the door window has a "frosted" coating, meaning that the view from the hallway is almost entirely obscured, aside from a small viewing window.

55.     The frosted coating on the dayroom window, pictured below, makes it impossible to meaningfully observe occupants in the room without approaching the door and peering directly into the viewing pane itself.



56.     Unlike the housing cells in the SHU, which have a number of suicide mitigation modifications, the dayroom has obvious suicide hazards, including a wall-mounted television with cords, cables, and a bracket, which are pictured below:



57.     Given that hanging is the leading cause of death among jail inmates who actually complete suicide, the presence of these hazards creates an increased risk to incarcerated persons experiencing suicidality.[3]

### JCSO Policies Regarding Inmate Suicide and Self-Harm

58.     JCSO officers have a duty to take reasonable care to prevent individuals in their custody from committing suicide.

59.     JCSO officers also have a Constitutional duty to take reasonable steps to protect inmates' safety and bodily integrity.

60.     In furtherance of this duty, the Jefferson County Defendants developed and implemented a standing General Post Order, a policy which requires a regular "walk-through" of the secure areas in the JCDF.

---

[3] Daniel, Anasseril E., *Preventing Suicide in Prison A Collaborative Responsibility of Administrative, Custodial, and Clinical Staff*, J. OF AM. ACAD. OF PSYCHIATRY & LAW, Vol. 34, 2006.

61.     Under the General Post Order titled "DET PO – WAL Walk-Through" (hereinafter the "Post Order"), officers are required to "[e]nsure that a walk-through is conducted at least every thirty (30) minutes on an irregular schedule throughout the watch, to ensure the safety and well-being of each inmate."

62.     The Post Order defines a walk-through as "a physical observation/check of inmates by deputies verifying their safety and security."

63.     In the JCDF, walk-throughs are documented electronically using the workstation computer in the SHU and each walk-through must be documented per the Post Order.

64.     Walk-throughs are time-stamped and logged on the Module Activity Report for each housing area.

65.     Officers can either create an entry using both a "start time" and "end time" for the walk-through, or simply record the activity after completing the walk-through, in which case both the "start time" and "end time" will be the same.

66.     There is also a surveillance system which captures video footage of various areas within JCDF, including the hallways, cells, and dayrooms within the SHU.

67.     The control room area in the SHU has a bank of monitors which displays 16 live feeds from the surveillance system, including a live feed from the dayroom in which Susanne Burgaz hanged herself.

68.     The surveillance system captured all of Susanne Burgaz's movements on August 31, 2017, up to and including the gut-wrenching sequence of events in the dayroom when she hanged herself.

69. The camera in the dayroom was aimed directly towards Susanne Burgaz throughout this process and has sufficient clarity such that any officer monitoring the live feed would immediately recognize that she was attempting suicide.

70. Similarly, any officer making a direct observation of Susanne in the dayroom—again, as required by the Post Order—would immediately detect that she was attempting self-harm.

71. But no one was paying attention.

72. As a result, the video surveillance system merely documented the tragedy instead of serving as a means to detect self-harm or otherwise prevent Susanne Burgaz from hanging herself in plain sight.

### *Susanne Burgaz Received Devastating News from Defendant Pesapane and Hanged Herself Almost Immediately Afterwards*

73. On August 31, 2017, the day after she was booked into the JCSO detention facility, Susanne Burgaz attended court on her pending criminal charges in Jefferson County.

74. Given that she was facing only low-level and non-violent charges, the judge reached a disposition on both matters and then ordered her release from JCSO custody.

75. Following her court appearance, Susanne Burgaz was transported back to the JCDF, expecting to be released per the court's order in a matter of hours.

76. Later that same evening, Susanne was moved to a dayroom—one of the only spaces in the SHU *without* meaningful suicide mitigation—while awaiting her release.

77. At approximately 9:02 p.m., Susanne stood up from her seat at the table in the dayroom and ambulated, using her walker, to the window facing the hallway, where she attempted to get the attention of an officer.

78. At approximately 9:03 p.m., Deputy Pesapane noticed Susanne and engaged her at the window. Susanne requested an update regarding her release status. Deputy Pesapane then went

13

to the control room and discovered that Susanne had two low-level, non-violent warrants from another jurisdiction and was therefore ineligible for release.

79. At approximately 9:05 p.m., Deputy Pesapane returned to the dayroom window and informed Susanne that she would not be released; instead, Susanne Burgaz would remain incarcerated indefinitely while awaiting extradition.

80. Susanne was distraught and insisted that she had paperwork to prove that she should be released immediately. Part of this conversation centered on the fact that Susanne was recently the victim of sexual violence and trauma—yet another indicator of suicide risk—and was therefore not extraditable. Susanne pled her case with Deputy Pesapane, who allowed Susanne to retrieve her legal paperwork from her cell.

81. After gathering some belongings, at approximately 9:09 p.m., Defendant Pesapane escorted Susanne back to the dayroom. Susanne sat down at the table, obviously despondent, and never even bothered to read any of her legal papers.

82. Defendant Pesapane knew or should have known that Susanne was in crisis at this point and an acute suicide risk.

83. Officer Pesapane was also aware, objectively and subjectively, that this change in legal status—from imminent release to indefinite detention—was deeply upsetting to Susanne.

***Susanne Burgaz Fashioned a Noose and Hanged Herself in Plain Sight***

84. At approximately 9:22 p.m., mere minutes after Deputy Pesapane delivered the devastating news that she would not be released, Susanne Burgaz stood up from her chair, shuffled over to the wall-mounted television, and began fashioning a noose from the wires and cords.

85. In order to access the television cords, she pulled the television away from the wall and pivoted the screen towards the entrance to the dayroom—behavior that was obviously atypical

14

and alarming to anyone who might be paying attention. Below is a photograph (a screen capture from the surveillance video in the dayroom) of Susanne attempting to disconnect the television cable such that she could fashion a noose:



86. Between 9:21 p.m. and 9:29 p.m., Susanne twice attempted to hang herself, but the noose did not hold, causing her to fall on the ground.

87. Finally, at 9:29 p.m., Susanne fashioned a noose, placed it around her neck, and shifted her weight towards the ground—all within a clear and direct line of sight from the observation window.

88. At approximately 10:00 p.m., *over 30 minutes after* Susanne hanged herself from the cables in the dayroom, deputies discovered her body suspended from the television cords.

### *Defendant Scalise Failed to Observe Susanne During His Walk-Through*

89. As detailed above, the Post Order requires officers to directly observe inmates at specified intervals to ensure their safety and well-being.

90. In this case, Defendant Scalise conducted a walk-through beginning at 9:25 p.m. on August 31, 2017, and entered his activity on the Module Activity Report at 9:28 p.m. after he ostensibly completed the task.

91. Defendant Scalise's entire walk-through is captured on video surveillance and the recording features a running time stamp that reveals his precise location and activities at all times.

92. This video surveillance further reveals that Defendant Scalise only directly observed inmates along *one side of the hall*—failing completely to make any direct observation of the dayroom in which Susanne Burgaz was being held.

93. By comparing the time stamps on this video alongside those of the dayroom, it is clear that Defendant Scalise walked past the dayroom at the precise moment when Susanne Burgaz successfully tied the noose for her third and final attempt to hang herself.

94. Had Defendant Scalise directly observed Susanne Burgaz during his walk-through, as required under the Post Order, he would have immediately recognized that she was attempting to harm herself by hanging.

95. Further, had Defendant Scalise directly observed Susanne Burgaz during his walk-through, he would have been able to intervene and ensure her safety.

96. In other words, had Defendant Scalise performed his duties with any semblance of care or reasonableness, Susanne Burgaz would be alive today.

### *Defendant Scalise Submitted Documents and Made Statements to Investigators That Are Obviously Contradicted by the Video Evidence*

97. Defendant Scalise later submitted an incident report related to Susanne Burgaz's death. In the report, Officer Scalise notes that "[e]arlier in the night, I completed a walkthrough of SHU at approximately 2128 hours. As I always do, I looked in each cell and dayroom to ensure

16

all inmates were acting and behaving normally. On this walk, I do not remember anything of significance occurring. All inmates in cells and dayrooms appeared to be normal to me."

98.     Subsequently, Defendant Scalise reaffirmed his position that he "remembered looking into ever cell and dayroom like his original supplemental report stated," when interviewed on January 1, 2018 by an external death investigator.

99.     Defendant Scalise's version of events is directly controverted by the video evidence.

100.    First, the video makes clear that Deputy Scalise never even approached the viewing window on the dayroom door; instead, he briskly walks down the far side of the hallway. Below is a screen capture of the hallway video, which shows Officer Scalise striding past the dayroom *on the far side of the hallway*, and looking into an inmate's cell directly opposite of the dayroom where Susanne was actively attempting suicide:



101. Second, even a cursory glance through the viewing pane on the dayroom window during Defendant Scalise's walk-through—as he walked towards the video camera mounted in the hallway— would have revealed that Susanne was actively engaged in an attempt to harm herself.

102. These facts, taken together, demonstrate that Defendant Scalise not only violated the Post Order and policies of JCSO, but that he was aware of such violations and took affirmative steps to cover-up such violations in the context of an external death investigation.

***Susanne Burgaz's Suicide is Part of a Broader Problem at the Jefferson County Jail***

103. The Module Activity Reports and video surveillance of the SHU reveal a clear and obvious pattern of gross violations of the Post Order and deliberate indifference relative to the serious medical needs of inmates at the JCDF.

104. These violations include false reporting of walk-throughs, in which the responsible officer or officers document a walk-through in the Module Activity Report, but fail to actually accomplish a walk-through in a manner consistent with the Post Order.

105. The Post Order also requires deputies to "[e]nsure that a walk-through is conducted at least every thirty (30) minutes on *an irregular schedule* throughout the watch . . . ."

106. These requirements—frequent walk-throughs at irregular intervals—are specifically designed to ensure inmate safety, and to afford deputies an opportunity to intervene should an inmate attempt suicide or self-harm.

107. However, even a cursory review of the Module Activity Reports reveals that jail staff often exceed the 30-minute interval set forth in the Post Order, meaning that inmates in the SHU are often left unattended for extended periods of time.

108. Moreover, even when the jail staff comply with the requirement to conduct a walk-through at least once every 30 minutes, the walk-through is almost always conducted within only

one or two minutes of the 30-minute required interval—meaning that the walk-throughs happen, if at all, at predictable intervals that defeat the very purpose of the walk-through itself.

109. Each of the violations described above are easily detectable by comparing the Module Activity Report for a given shift with the available surveillance footage.

110. These violations are systematic and represent both an endorsement of the deliberately indifferent actions of JCSO officers and a failure to supervise and/or train deputies employed by JCSO.

## FIRST CLAIM FOR RELIEF

**42 U.S.C. § 1983 – Fourteenth Amendment Violation**
**Deliberate Indifference to Serious Medical Needs**
**(Estate of Susanne Burgaz against Individual Defendants)**

111. Plaintiff hereby incorporates all other paragraphs of this Civil Rights Complaint and Jury Demand as if fully set forth therein.

112. At all times relevant to the allegations in this Complaint, the Individual Defendants were working under color of state law.

113. All of the Individual Defendants are persons under 42 U.S.C. § 1983.

114. Susanne Burgaz had a clearly established right under the Fourteenth Amendment to the United States Constitution to be free from deliberate indifference to her known serious medical needs.

115. Each individual Defendant knew or should have known of this clearly established right at the time of the incidents described in this Civil Rights Complaint and Jury Demand.

116. At all relevant times, each Individual Defendant knew of and disregarded the excessive risks associated with Susanne Burgaz's serious mental health needs, suicidality, and other medical conditions.

19

117. With deliberate indifference to Susanne Burgaz's Constitutional right to adequate medical care, as provided by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, the Individual Defendants knowingly failed to, without limitation, monitor, observe, and otherwise care for Susanne Burgaz's acute mental health and medical conditions. They did so despite their knowledge of her serious mental health and medical conditions, placing her at risk of serious physical harm or death.

118. The Individual Defendants knew or were aware that Susanne Burgaz faced a substantial risk of harm and disregarded such risk by failing to intervene or take other measures which might reduce the risk.

119. Despite an awareness that Susanne Burgaz was in need of represented an acute suicide risk and required assistance, the Individual Defendants acted with deliberate indifference to her readily apparent need for mental health and medical attention and her Constitutional rights by refusing to obtain and provide any medical treatment or other intervention for her.

120. All of the deliberately indifferent acts of each Individual Defendants were conducted within the scope of their official duties and employment.

121. The acts or omissions of each Individual Defendants were the legal and proximate cause of Susanne Burgaz's injuries and death.

122. The acts and omissions of each Individual Defendant caused Suanne Burgaz damages in that she suffered extreme physical and mental pain, injuries, and death while she was in Defendants' custody.

123. The intentional actions or inactions of each Individual Defendant as described herein intentionally deprived Susanne Burgaz of due process and of rights, privileges, and liberties secured by the Constitution of the United States of America, and caused her other damages.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourteenth Amendment Violation**
**Entity Liability**
**(Estate of Susanne Burgaz against Jefferson County Defendants)**

124. Plaintiff hereby incorporates all other paragraphs of this Civil Rights Complaint and Jury Demand as if fully set forth herein.

125. The Jefferson County Defendants are persons within the meaning of 42 U.S.C. § 1983.

126. At all relevant times, the Jefferson County Defendants were acting under color of state law and had a non-delegable duty to provide Constitutionally adequate medical care for detainees.

127. The intentional acts or omissions of Jefferson County Defendants were conducted within the scope of their official duties and operations.

128. The Jefferson County Defendants acted with deliberate indifference and unconstitutional policies, customs, and/or practices regarding the treatment of individuals with mental illness, suicidality, and other disabilities and the provision of Constitutionally adequate medical care, which was the moving and proximate cause of the Susanne Burgaz's suffering and injuries.

129. The Jefferson County Defendants were deliberately indifferent with respect to the proper training and supervision of their employees regarding the provision of necessary medical care and intervention to detainees at the FCDC.

130. The Jefferson County Defendants endorsed the deliberate indifference of the Individual Defendants and other officers employed by JCSO regarding inmate safety and the treatment of individuals experiencing suicidality, mental illness, and other medical issues.

131. The failures in training, supervision and policy regarding providing necessary

medical supervision, care, and intervention were so obvious that the failure to provide the same was deliberately indifferent to the rights of Susanne Burgaz and other detainees.

132. The Jefferson County Defendants' deliberately indifferent customs, and failures to train/supervise, are all actionable policy decisions that were moving forces and proximate causes of Susanne Burgaz's harms and injuries and the violation of her Constitutional rights.

133. The policies, customs, and practices of the Jefferson County Defendants as described herein were also moving forces in and proximate causes of the deprivation of Susanne Burgaz's right to due process and of the rights, privileges, and liberties secured by the Constitution of the United States of America.

### THIRD CLAIM FOR RELIEF
**Negligence in the Operation of a Jail Resulting in Wrongful Death**
**(Plaintiffs against Jefferson County and Individual Defendants)**

134. Plaintiffs hereby incorporate all other paragraphs of this Civil Rights Complaint and Jury Demand as if fully set forth herein.

135. Pursuant to the CGIA, governmental immunity is waived for any action for injuries by a pre-trial detainee resulting from the negligent operation of any correctional facility or jail. *See* C.R.S. § 24-10-106(1)(b).

136. The operation of a correctional facility includes the adequate provision of medical care necessary for basic health for purposes of the CGIA and Susanne Burgaz was a pre-trial detainee.

137. The Individual Defendants and Jefferson County Defendants are therefore not entitled to immunity under the CGIA.

138. In the performance of their duties, the JCSO personnel who participated in Susanne Burgaz's detention had a duty to not act in a manner that created an unreasonable risk of injury or

22

damage to Susanne Burgaz's life or property.

139. As described above, the Individual Defendants negligently committed acts and omissions, including, without limitation, the following, each of which contributed to creating an unreasonable risk of injury or damage to life or property:

a. failing to detect or intervene when Susanne Burgaz exhibited obvious signs of despondency and potential suicidality;

b. failing to conduct walk-throughs within the required 30-minute time period;

c. failing to conduct walk-throughs at irregular intervals to ensure inmate safety;

d. failing to directly observe Susanne Burgaz during walk-throughs;

e. failing to monitor Susanne Burgaz electronically despite signs of obvious distress, suicidality, and the potential for self-harm;

f. leaving Susanne Burgaz unattended and unmonitored in an area with ready access to materials that could be used for self-harm; and

g. ignoring obvious signs of distress, suicidality, and the potential for self-harm.

140. At all relevant times, the Individual Defendants were acting within the scope of their employment.

141. The Jefferson County Defendants are vicariously liable for the negligent conduct of the Individual Defendants.

142. The Jefferson County Defendants are also directly liable as they breached their duty to exercise reasonable care in the training and supervision of their employees.

143. As a direct and proximate result of the Individual Defendant's breach of their duty to provide reasonable care and treatment to the Plaintiff in the operation of a jail, including, without limitation, exercising their duty to obtain necessary mental health and medical care, the Plaintiff

23

was harmed and suffered injuries.

144. The Jefferson County Defendants knew or should have known of the lack of supervision, experience, and training among their employees and agents was likely to harm JCDF detainees in need of medical care, including Susanne Burgaz.

145. In failing to exercise reasonable care in the training and supervision of their employees and agents, as it relates to their providing reasonable supervision of inmates and detainees, the Jefferson County Defendants were negligent and proximately caused Susanne Burgaz's death.

146. As a result of such negligence, the Plaintiffs have suffered damages, losses, and injuries in an amount to be determined at trial. These damages include, without limitation, pain and suffering, grief, upset, loss of society and companionship, anger, depression, and all other non-economic damages allowed under the Colorado Wrongful Death Act.

**FOURTH CLAIM FOR RELIEF**
**Survival**
**(Plaintiffs against Jefferson County and Individual Defendants)**

147. Plaintiffs hereby incorporate all other paragraphs of this Civil Rights Complaint and Jury Demand as if set forth fully herein.

148. The individual Plaintiffs set forth above are heirs to the Estate of Susanne Burgaz.

149. As a result of the deliberate indifference and/or negligence of the Jefferson County and Individual Defendants described herein, Plaintiffs have suffered injuries and damages, including, without limitation, funeral expenses, emotional distress, pain and suffering, and loss and enjoyment of life.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in his favor and against Defendants, and grant:

(a) All appropriate relief at law and equity;

(b) Declaratory relief and other appropriate equitable relief;

(c) Economic losses on all claims allowed by law;

(d) Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(e) Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(f) Attorneys' fees and costs associated with this action, including expert witness fees, on all claims allowed by law;

(g) Pre- and post-judgment interest at the highest lawful rate; and

(h) Any further relief that this Court deems just and proper; and any other relief as allowed by law.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 14th day of May, 2019.

HIGHLANDS LAW FIRM

*/s/ Zachary D. Warren*
Zachary D. Warren
501 S. Cherry St.
11th Floor
Denver, Colorado 80246
(720) 722-3880 (p)
(720) 815-3380 (f)
zwarren@highlandslawfirm.com
*Counsel for Plaintiff*